Corrie J. Yackulic
CORRIE YACKULIC LAW FIRM PLLC
110 Prefontaine Place South, Suite 304
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725
Corrie@cjylaw.com

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| LIESE MEAD and ROBERT A. MEAD, *wife and husband and their marital community comprised thereof,*<br><br>*Plaintiffs*,<br><br>v.<br><br>BOSTON SCIENTIFIC CORPORATION,<br><br>*Defendant*. | Case No.<br><br>**COMPLAINT**<br><br>***JURY DEMAND*** |

## I.   COMPLAINT

COME NOW LIESE MEAD and ROBERT A. MEAD as Plaintiffs herein and file this Complaint, alleging as follows:

## II.   INTRODUCTION

1.     On April 6, 2016, Plaintiff LIESE MEAD was surgically implanted with the Boston Scientific Advantage Fit, Model No. M0068502111; BX/5-LOG 2579385, Lot No. 0000031789 transvaginal mesh ("the medical device"). Neither Plaintiff nor her healthcare providers were warned that the medical device used in the surgery – the transvaginal mesh– was negligently designed and manufactured. Nor were they warned that this transvaginal mesh device was unreasonably dangerous – even when used exactly as intended by Boston Scientific. To the

COMPLAINT WITH JURY DEMAND
PAGE 1

contrary, Boston Scientific promoted, marketed and sold the type of transvaginal mesh device implanted in Plaintiff (and thousands of women like Plaintiff) to the FDA, to healthcare providers, and to the public at large as a safe alternative to other procedures that did not incorporate the Defendant's product. As a result of being surgically implanted with Defendant's unreasonably dangerous medical device that was unfit for the purpose it was designed and sold, Plaintiff has suffered, and continues to suffer, debilitating injuries. Plaintiffs bring this suit for damages relating to those injuries.

### III.    PARTIES

2.     Plaintiffs LIESE MEAD and ROBERT A. MEAD are residents of Olympia, Washington.

3.     Defendant Boston Scientific is a Massachusetts corporation with its principal place of business in Massachusetts.

### IV.    JURISDICTION AND VENUE

4.     This Court has subject matter jurisdiction over the parties pursuant to 28 U.S.C. § 1332(a) because the parties are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

5.     Venue is proper as Defendant marketed and sold its pelvic mesh product in this District.

6.     Defendant conducted substantial business in the State of Washington and in this District, distributes Pelvic Mesh Products in this District, receives substantial compensation and profits from sales of Pelvic Mesh Products in this District, and made material omissions and

COMPLAINT WITH JURY DEMAND
PAGE 2

misrepresentations and breaches of warranties in this District so as to subject it to *in personam* jurisdiction in this District.

7.    Defendant conducted business in the State of Washington through sales representatives because Defendant was engaged in testing, developing, manufacturing, labeling, marketing, distributing, promotion and/or selling, either directly or indirectly, and/or through third parties or related entities, Pelvic Mesh Products; thus, there exists a sufficient nexus between Defendant's forum contacts and the Plaintiffs' claims to justify assertion of jurisdiction in Washington.

8.    Consistent with the Due Process Clause of the Fifth and Fourteenth Amendments, this Court has *in personam* jurisdiction over Defendant, because Defendant is present in the State of Washington such that requiring an appearance does not offend traditional notices of fair play and substantial justice.

## V.    **FACTUAL BACKGROUND**

**A.  Stress-Urinary Incontinence and Pelvic Organ Prolapse**

9.    Boston Scientific promoted its medical devices as devices intended to treat stress urinary incontinence and/or pelvic organ prolapse.

10.    Stress urinary incontinence ("SUI") is the involuntary loss of urine during movement that puts pressure on the bladder, such as laughing, coughing, or sneezing, or during aerobic or strenuous exercise. Although incontinence is suffered by men and women, it is more common in women and can be caused by menopause or by physical changes that occur to the body during pregnancy or childbirth.

COMPLAINT WITH JURY DEMAND
PAGE 3

**Corrie Yackulic Law Firm PLLC**
110 Prefontaine Place South, Suite 304
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

11.     Childbirth, for example, can injure the pelvic floor muscles and ligaments that help support a woman's bladder. If these structures weaken, the bladder can move downward, pushing slightly out of the bottom of the pelvis toward the vagina. The movement of the bladder, or other pelvic organs, such as the urethra, cervix or rectum, is known as pelvic organ prolapse ("POP"). A prolapsed bladder can prevent the muscles that ordinarily force the urethra shut from squeezing as tightly as they should, resulting in an involuntary loss of urine.

12.     Stress urinary incontinence can be embarrassing and uncomfortable. Pelvic organ prolapse is also uncomfortable and can interfere with urinary and defecatory functions, many daily activities, and sex.

13.     Both SUI and POP are, in many cases, treatable. A woman who elects to have her SUI or POP surgically treated has several options. SUI, for example, can be corrected through traditional abdominal surgery using sutures to attach the urethra to a ligament in the pelvis (known as the "Burch procedure"). SUI can also be surgically addressed using synthetic materials such as suprapubic mid-urethral "slings" placed under the urethra to provide support Similarly, POP can be corrected through abdominal or transvaginal surgery and using biologic composite, or synthetic materials.

14.     Surgical mesh products have been used to repair abdominal hernias since the 1950s. In the 1970s, gynecologists began using surgical mesh products that were designed for hernia repair for abdominal repair to surgically repair prolapsed organs. In the 1990s, gynecologists began using this surgical mesh for the surgical treatment of SUI.

15.     Manufacturers (such as Boston Scientific) also began to modify the mesh used in hernia repair to be used as products specifically intended to correct SUI and POP. Until very

COMPLAINT WITH JURY DEMAND
PAGE 4

recently, Boston Scientific, among other manufacturers, sold pelvic mesh "kits" which included not only the surgical mesh, but also tissue fixation anchors and insertion tools.

16.     The surgical mesh products manufactured by Boston Scientific (and others) are considered Class II medical devices.

17.     Under the 510(k) process, a manufacturer must provide a premarket notification that allows the FDA to determine whether the device is substantially equivalent to a "predicate device." A predicate device is one that the FDA has placed into one of three classification categories and "cleared" for marketing.

18.     Unlike Class III medical devices, such as an artificial heart or an Automated External Defibrillator, Class II devices do not require "approval" by the FDA. Whereas Class III devices cannot be sold until the manufacturer demonstrates to the FDA, through adequate and well-controlled clinical trials, that the proposed device is safe and effective, there is no such requirement for Class II devices. The "premarket notification" process – for Class II devices – is not focused on whether the device is safe and effective, but rather is concerned with whether the proposed device is substantially equivalent to an existing predicate device that was already cleared for marketing by the FDA.

19.     Defendant was aware, or should have been aware, of the dangers inherent in its transvaginal mesh products generally, including the Advantage system, notwithstanding the fact that these products were "cleared" for sale by the FDA.

**B. Plaintiff Liese Mead's Medical History and Experience**

20.     In or before April, 2016, Plaintiff LIESE MEAD was diagnosed as suffering from uterine prolapse.

**Corrie Yackulic Law Firm PLLC**
110 Prefontaine Place South, Suite 304
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

21.     On April 6, 2016, Plaintiff LIESE MEADE underwent surgery to correct her symptoms.

22.     The transvaginal mesh device used in Plaintiff's surgery was the Boston Scientific Advantage Fit, which was designed, manufactured, and sold by Defendant Boston Scientific.

23.     Plaintiff's surgery was performed without complications. She was discharged the day following her surgery.

24.     In November 2016.  Plaintiff LIESE MEAD lifted a heavy object and prolapse reoccurred.  She underwent a surgery in or around November 2016 to address the prolapse.

25.     On October 19, 2017 Plaintiff LIESE MEAD saw Dr. Una Lee at Virginia Mason Medical Center.  Dr. Lee noted that LIESE MEAD'S vault was well supported and recommended against any surgery.  She recommended conservative treatment.

26.     On October 19, 2017 Plaintiff LIESE MEAD underwent a cystourethroscopy at Virginia Mason Medical Center to 0

27.      Unfortunately, Plaintiff LIESE MEAD'S symptoms of pain became worse, and on June 25, 2018 she underwent complete excision of the mesh.  Granulation tissue was excised and treated.

28.     The severe problems that Plaintiff suffered after her implant surgery were caused by the negligent design and manufacture of the Medical Device that was surgically implanted in her. In addition, the revision surgeries that Plaintiff underwent were necessitated by the negligent design and manufacture of the Medical Device used in the Plaintiff's original procedure.

29.     That Plaintiff's injuries were caused by the negligent design and manufacture of the Medical Device is supported by the fact that the FDA has received thousands of reports of

COMPLAINT WITH JURY DEMAND
PAGE 6

**Corrie Yackulic Law Firm PLLC**
110 Prefontaine Place South, Suite 304
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

women who were injured or killed after being implanted with devices similar to that used in Plaintiff's procedure.

30.     As discussed below, the FDA responded to the volume of reports of injuries arising from the implant of surgical mesh by issuing a "Public Health Notification" relating to the use of these devices. In July 2011, the FDA also took the unusual step of issuing an "update" to this Public Health Notification. In 2019 the FDA banned the further sale of transvaginal mesh slings for pelvic organ prolapse.  These publications confirm the dangerous nature of the Defendant's mesh products, including the Advantage system used in Plaintiff's surgery.

**C.  FDA Public Health Notifications**

31.     On October 20 2008, the FDA issued a Public Health Notification ("PHN") entitled "Serious Complications Associated with Transvaginal Placement of Surgical Mesh in Repair of Pelvic Organ Prolapse and Stress Urinary Incontinence."

32.     In the 2008 PHN, the FDA reported that it received "over 1,000 reports from nine surgical mesh manufacturers of complications that were associated with surgical mesh devices used to repair POP and SUI." The listed complications included: "erosion … infection, pain, urinary problems, and a recurrence of prolapse and/or incontinence … [and] bowel, bladder, and blood vessel perforation during insertion." The PHN went on to note that "vaginal scarring and mesh erosion led to a significant decrease in patient quality of life due to discomfort and pain, including dyspareunia."

COMPLAINT WITH JURY DEMAND
PAGE 7

**Corrie Yackulic Law Firm PLLC**
110 Prefontaine Place South, Suite 304
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

33.     Although neither Boston Scientific nor its Medical Devices were specifically identified in the PHN, a review of the relevant FDA database reveals that the FDA received multiple "adverse event reports" relating to this product.

34.     On July 13, 2011, the FDA issued an update to its 2008 PHN (the "Update"). The FDA stated that it issued the Update to advise that, contrary the assertion in the earlier PHN, "serious complications associated with surgical mesh for transvaginal repair of POP are **not rare**" (emphasis in the original).

35.     Whereas the 2008 PHN described "over 1,000 reports" of complications relating to surgical mesh, the Update stated that from January 1, 2008 through December 31, 2010, "the FDA received 2,874 additional reports of complications associated with surgical mesh devices used to repair POP and SUI."

36.     The FDA Update also expanded the number of complications associated with insertion of surgical mesh from what was identified in 2008. According to the Update, from 2008-2010, "the most frequent complications reported to the FDA for surgical mesh devices for POP repair include mesh erosion through the vagina (also called exposure, extrusion[,] or protrusion), pain infection, bleeding, pain during sexual intercourse (dyspareunia), organ perforation, and urinary problems. There were also reports of recurrent prolapsed, neuromuscular problems, vaginal scarring/shrinkage, and emotional problems."

37.     Plaintiff experienced many of the complications referenced in the 2011 Update, including, without limitation, pain, bleeding, vaginal scarring, continued incontinence, and a recurrence of organ prolapse.

COMPLAINT WITH JURY DEMAND
PAGE 8

**Corrie Yackulic Law Firm PLLC**
110 Prefontaine Place South, Suite 304
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

38.     Not only did the FDA Update describe more complications associated with transvaginal mesh surgeries, it called into question the benefit of using mesh products instead of traditional procedures that did not involve the use of mesh.

39.     Specifically, the Update stated: "it is not clear that transvaginal POP repair with mesh is more effective than traditional non-mesh repair in all patients with POP and it may expose patients to greater risk."

40.     The FDA further stated that "[i]n order to better understand the use of surgical mesh for POP and SUI, [it] conducted a systematic review of the published scientific literature from 1996-2011 to evaluate its safety and effectiveness. The review showed that transvaginal POP repair with mesh does not improve symptomatic results or quality of life over traditional non-mesh repair. In particular the literature review revealed:

a.   Mesh used in transvaginal POP repair introduces risks not present in traditional non-mesh surgery for POP repair.

b.   Mesh placed abdominally for POP repair appears to result in lower rates of complications compared to transvaginal POP surgery with mesh.

c.   There is no evidence that transvaginal repair to support the top of the vagina (apical repair) or the back of the vagina (posterior repair) with mesh provides any added benefit compared to traditional surgery without mesh.

d.   While transvaginal surgical repair to correct weakened tissue between the bladder and vagina (anterior repair) with mesh augmentation may provide an anatomic benefit compared to traditional POP repair without mesh, this anatomic benefit may not result in better symptomatic results.

COMPLAINT WITH JURY DEMAND
PAGE 9

41.     Defendant Boston Scientific knew or should have known about the complications associated with its transvaginal mesh products, identified in the 2008 PHN and the 2011 Update.

42.     Defendant Boston Scientific knew or should have known that its transvaginal mesh products unreasonably exposed patients to great risk while conferring no benefit over traditional procedures that did not use mesh.

43.     Contemporaneously with the Update, the FDA also released a publication prepared in conjunction with the Center for Devices and Radiological Health ("CDRH") entitled "Urogynecologic Surgical Mesh: Update on the Safety and Effectiveness of Transvaginal Placement for Pelvic Organ Prolapse."

44.     Whereas the Update stated that the FDA performed a search of medical literature "in order to better understand the use of surgical mesh for POP and SUI," the FDA/CDRH publication stated the FDA conducted the search "due to ongoing concerns in the clinical community and the safety signals identified from adverse event reports." The FDA/CDRH publication cited to various peer-reviewed publications as support for the following facts, among others:

    a.   Patients who undergo POP repair with mesh are subject to mesh-related complications that are not experienced by patients who undergo traditional surgery without mesh;

    b.   Adverse events associated with transvaginal mesh can be life-altering for some women;

    c.   The pain associated with transvaginal mesh can continue even after the mesh is surgically removed; and  · Patients who undergo traditional POP repair without

COMPLAINT WITH JURY DEMAND
PAGE 10

**Corrie Yackulic Law Firm PLLC**
110 Prefontaine Place South, Suite 304
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

mesh have equivalent improvement in quality of life when compared to patients

who undergo transvaginal POP treatment with mesh.

45.     The FDA concluded the FDA/CDRH publication by noting that it "has identified

serious safety and effectiveness concerns over the use of surgical mesh for the transvaginal repair

of pelvic organ prolapse."

46.      In light of these concerns, the FDA has considered several regulatory changes

regarding transvaginal mesh. These include:

a.  Changing the risk classification of transvaginal mesh from a Class II to a Class III

device. As noted above, such a change would require manufacturers to obtain

FDA "premarket approval" after providing it with clinical data showing the safety

and effectiveness of a new device. Mesh manufacturers would no longer be able

to market new transvaginal mesh products after simply providing the FDA with

"premarket notice" that the device is equivalent to an existing predicate device;

b.  Conducting clinical studies to address the risks and benefits of mesh to treat POP

and SUI; and

c.  Expanded post-market monitoring of transvaginal mesh performance.

47.     According to a notice published in the Federal Register, The Obstetrics-

Gynecology Devices Panel of the Medical Devices Advisory Committee of the FDA is

scheduled meet in September 2011 "to discuss the safety and effectiveness of transvaginal

placement of mesh for POP and SUI procedures."

48.     A review of scientific literature and other sources indicate that the defects in the

mesh relate to any or all of the following:

COMPLAINT WITH JURY DEMAND
PAGE 11

a.  the use of polypropylene material in the Mesh itself and the immune reaction that results, causing adverse reactions and injuries;

b.  the design of the Pelvic Mesh Device to be inserted transvaginally into an area of the body with high levels of bacteria, yeast, and fungus that adhere to the mesh causing immune reactions and subsequent tissue breakdown and adverse reactions and injuries;

c.  biomechanical issues with the design of the mesh that create strong amounts of friction between the mesh and the underlying tissue that subsequently cause that tissue to degrade resulting in injury;

d.  the use and design of anchors in the Pelvic Mesh Product which when placed correctly are likely to pass through and injure major nerve routes in the pelvic region;

e.  degradation of the mesh itself over time which causes the internal tissue to degrade resulting in injury;

f.  the welding of the mesh itself during production which creates a toxic

g.  substance that contributes to the degradation of the mesh and host tissue alike; and/or

h.  the design of trocars, as devices to insert the Pelvic Mesh Product into the vagina, are defective because the device requires tissue penetration in nerve-rich environments which frequently results in the destruction of nerve endings, causing pain and other injuries.

COMPLAINT WITH JURY DEMAND
PAGE 12

49. On April 16, 2019, the FDA announced that it was banning the sale of all transvaginal mesh products intended for pelvic organ prolapse repair.

**D. Factual Allegations Common to All Counts**

50.     Defendant's pelvic mesh products incorporate a monofilament polypropylene mesh intended for the treatment of stress urinary incontinence. Despite claims that this material is inert, the scientific evidence is that this material is biologically incompatible with human tissue and promotes an immune response in a large subset of the population receiving Defendant's pelvic mesh products containing this material. This immune response promotes degradation of the pelvic tissue and can contribute to the formation of severe adverse reactions to the mesh.

51.     Defendant's pelvic mesh products were marketed to the medical community and to patients as safe, effective, reliable, medical devices; implanted by safe and effective, minimally invasive surgical techniques for the treatment of medical conditions, primarily pelvic organ prolapse or stress urinary incontinence, and as safer and more effective as compared to the traditional products and procedures for treatment, and other competing pelvic mesh products.

52.     The Defendant marketed and sold its pelvic mesh products to the medical community at large and patients through carefully planned, multifaceted marketing campaigns and strategies. These campaigns and strategies include, but are not limited to, aggressive marketing to health care providers at medical conferences, hospitals, private offices, and include the provision of valuable cash and non-cash benefits to health care providers. Also utilized are documents, brochures, and websites, offering exaggerated and misleading expectations as to the safety and utility of the products.

COMPLAINT WITH JURY DEMAND
PAGE 13

**Corrie Yackulic Law Firm PLLC**
110 Prefontaine Place South, Suite 304
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

53.     Contrary to the Defendant's representations and marketing to the medical community and to the patients themselves, the Defendant's Medical Devices have high failure, injury, and complication rates, fails to perform as intended, requires frequent and often debilitating re-operations, and has caused severe and irreversible injuries, conditions, and damage to a significant number of women, including Plaintiff, making it defective under the law. The Defendant has consistently underreported and withheld information about the propensity of its pelvic mesh products, to fail and cause injury and complications, and has misrepresented the efficacy and safety of its products and, through various means and media, actively and intentionally been misleading the FDA, the medical community, patients, and the public at large.

54.     Boston Scientific has known and continues to know that some of the predicate products for their Medical Devices had high failure and complication rates, resulting in the recall of some of these predicate devices; that there were and are differences between the Defendant's Medical Devices and some or all of the predicate products, rendering them unsuitable for designation as predicate products; that significant differences exist and existed between the Advantage system and their predecessor and predicate products, such that the disclosures to the FDA were and are incomplete and misleading; and that the Medical Devices were and are causing numerous patients severe injuries and complications. The Defendant suppressed this information, and failed to accurately and completely disseminate or share this and other critical information with the FDA, health care providers, or the patients. As a result, the Defendant actively and intentionally misled and continues to mislead the public, including the medical community, health care providers and patients, into believing that the Medical Devices and the

COMPLAINT WITH JURY DEMAND
PAGE 14

procedures for the implantation were and are safe and effective, leading to the prescription for and implantation of the Medical Device into Plaintiff.

55.     Boston Scientific failed to perform or rely on proper and adequate testing and research in order to determine and evaluate the risks and benefits of the Advantage system.

56.     Boston Scientific failed to design and establish a safe, effective procedure for removal of their pelvic mesh products; therefore, in the event of a failure, injury, or complications it is impossible to easily and safely remove the Medical Device(s).

57.     Feasible and suitable alternative designs as well as suitable alternative procedures and instruments for implantation have existed at all times relevant as compared to the Advantage system.

58.     The Medical Device was at all times utilized and implanted in a manner foreseeable to Defendant, as Defendant generated the instructions for use, created the procedure for implanting the device, and trained the implanting physicians.

59.     The Defendant provided incomplete, insufficient, and misleading training and information to physicians, in order to increase the number of physicians utilizing the Medical Device, and thus increased the sales of the Medical Device, and also leading to the dissemination of inadequate and misleading information to patients, including Plaintiff.

60.     The Medical Device implanted into Plaintiff were in the same or substantially similar condition as it was when it left the possession of Boston Scientific, and in the condition directed by and expected by Defendant.

61.     Plaintiff and her physicians foreseeably used and implanted Defendant's Medical Device, and did not misuse, or alter the Medical Device in an unforeseeable manner.

**Corrie Yackulic Law Firm PLLC**
110 Prefontaine Place South, Suite 304
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

62.     The injuries, conditions, and complications suffered by women who have been implanted with Defendant's pelvic mesh products, such as the Advantage system, include without limitation: mesh erosion, mesh contraction, infection, fistula, inflammation, scar tissue, organ perforation, dyspareunia, blood loss, neuropathic and other acute and chronic nerve damage and pain, pudendal nerve damage, pelvic floor damage, chronic pelvic pain, urinary and fecal incontinence, the recurrent prolapse of organs, and in many cases the women have been forced to undergo intensive medical treatment, including but not limited to operations to locate and remove mesh, operations to attempt to repair pelvic organs, tissue, and nerve damage, the use of pain control and other medications, injections into various areas of the pelvis, spine, and the vagina, and operations to remove portions of the female genitalia.

63.     The medical and scientific literature studying the effects of polypropylene pelvic mesh, like Defendant's pelvic mesh products, have examined each of these injuries, conditions, and complications and determined that they are, in fact, casually related to the mesh itself and do not often implicate errors related to the implantation of the devices.

64.     Boston Scientific misrepresented to the medical and healthcare community, Plaintiff, the FDA, and the public at large that the pelvic mesh products had been tested and were found to be safe and effective for the purposes of treating incontinence and/or prolapse.

65.     These representations were made by Boston Scientific with the intent of inducing Plaintiff, the medical community, and the public to recommend, prescribe, dispense, and purchase the Medical Device for use as a means of treatment for stress urinary incontinence and/or prolapse, all of which evinced an indifference to the health, safety, and welfare of Plaintiff.

COMPLAINT WITH JURY DEMAND
PAGE 16

66.     Boston Scientific acted unreasonably in failing to undertake its duties to properly know the qualities of its products and in representations to Plaintiff and/or to Plaintiff's healthcare providers, and concealed and intentionally omitted the following material information:

    a.   That the Medical Device was not as safe as other products and procedures available to treat incontinence and/or prolapse;

    b.   That the risk of adverse events with the Medical Device was higher than with other products and procedures available to treat incontinence and/or prolapse;

    c.   That the risk of adverse events with the Medical Device was not adequately tested and were known by Boston Scientific;

    d.   That the limited clinical testing revealed the Medical Device had a higher risk of adverse effects, in addition to, and above and beyond those associated with other products and procedures available to treat incontinence and/or prolapse;

    e.   That Boston Scientific failed to follow up on the adverse results from clinical studies and buried and/or misrepresented those findings;

    f.   That Boston Scientific was aware of dangers in its pelvic mesh products, including the Advantage system, in addition to and above and beyond those associated with other products and procedures available to treat incontinence and/or prolapse;

    g.   That pelvic mesh systems were dangerous and caused adverse side effects, including but not limited to higher incidence of erosion and failure, at a much

COMPLAINT WITH JURY DEMAND
PAGE 17

more significant rate than other products and procedures available to treat

incontinence and/or prolapse;

h.  That patients frequently would need revisionary surgery due to changes in the

structure of the Medical Device that would cause it to be become loose, or shift

position within the body.

i.  That patients needed to be monitored more regularly than usual while using the

Medical Device and that in the event the product needed to be removed that the

procedure to remove them had a very high failure rate and/or needed to be

performed repeatedly.

67.  Boston Scientific was under a duty to disclose to Plaintiff and her physicians the

defective nature of the Medical Device, including, but not limited to, the heightened risks of

erosion, failure and permanent injury.

68.  Boston Scientific had sole access to material facts concerning the defective nature

of the Medical Device and its propensity to cause serious and dangerous side effects and hence,

cause dangerous injuries and damage to persons who used the Medical Device.

69.  Defendant's concealment and omissions of material facts concerning the safety of

its pelvic mesh products were made to cause Plaintiff's physicians and healthcare providers to

purchase, prescribe, and/or dispense the Medical Device; and/or to mislead Plaintiff into reliance

and cause Plaintiff to use the Medical Device.

70.  At the time these representations were made by Boston Scientific, and at the time

Plaintiff used the Medical Device, she was unaware of the falsehood of these representations,

and reasonably believed them to be true.

COMPLAINT WITH JURY DEMAND
PAGE 18

71.     Defendant knew and had reason to know that the Medical Device could and would cause severe and grievous personal injury to their users, and that it was inherently dangerous in a manner that exceeded any purported, inaccurate, or otherwise downplayed warnings.

72.     In reliance upon these false representations, Plaintiff was induced to, and did, use the Medical Device thereby sustaining severe and permanent personal injuries and damages.

73.     Boston Scientific knew or had reason to know that Plaintiff and her physicians and other healthcare providers had no way to determine the truth behind Defendant's concealment and omissions, and that these included material omissions of facts surrounding the use of the Medical Device, as described in detail herein.

74.     As a result of Defendant's research and testing and lack thereof, it distributed false information, including but not limited to assuring Plaintiff, the public, and Plaintiff's healthcare providers and physicians that the Medical Device was safe for use as a means of providing relief from stress urinary incontinence and/or prolapse and was as safe or safer than other products and/or procedures available and on the market. As a result of Defendant's research and testing, and lack thereof, Defendant intentionally omitted, concealed and suppressed certain results of testing and research to healthcare professionals, Plaintiff, and the public at large.

75.     Defendant had a duty when disseminating information to the public to disseminate truthful information; and a parallel duty not to deceive the public, Plaintiff, Plaintiff's healthcare providers, and the FDA.

COMPLAINT WITH JURY DEMAND
PAGE 19

76.     The information distributed to the public, the medical community, the FDA, and Plaintiff by Boston Scientific included, but was not limited to, reports, press releases, advertising campaigns, television commercials, print advertisements, billboards and other commercial media containing material representations, which were false and misleading, and contained omissions and concealment of the truth about the dangers of the use of the Medical Device.

77.     Boston Scientific intentionally made material misrepresentations to the medical community and public, including Plaintiff, regarding the safety of the Medical Device specifically that it did not have dangerous and/or serious adverse health safety concerns, and that it was as safe as other means of treating stress urinary incontinence and/or prolapse.

78.     Defendant intentionally failed to inform the public, including Plaintiff, of the high failure rate, including erosion, the difficulty of removing the Medical Device, and the risk of permanent injury.

79.     Boston Scientific chose to over-promote the safety, efficacy and benefits of the Medical Devices instead.

80.     Defendant's intent and purpose in making these misrepresentations was to deceive the public, the medical community, and Plaintiff; to gain the confidence of the public, the medical community, and Plaintiff; to falsely assure them of the quality and fitness for use of the Medical Device; and induce Plaintiff, the public and the medical community to request, recommend, prescribe, dispense, purchase, and continue to use the Medical Device.

81.     Boston Scientific made claims and representations in documents it submitted to the FDA and in its reports to the public and to healthcare professionals and in advertisements that the Medical Device did not present serious health risks.

COMPLAINT WITH JURY DEMAND
PAGE 20

82.     These representations, and others made by Boston Scientific, were false when made and/or were made with the pretense of actual knowledge when such knowledge did not actually exist, and were made recklessly and without regard to the true facts.

83.     These representations, and others made by Boston Scientific, were made with the intention of deceiving Plaintiff, Plaintiff's healthcare professionals, and other members of the healthcare community, and were made in order to induce Plaintiff, and her healthcare professionals, to rely on misrepresentations, and caused Plaintiff to purchase, rely, use, and request the Medical Device and her healthcare professionals to dispense, recommend, or prescribe the Medical Device.

84.     Boston Scientific recklessly and/or intentionally falsely represented the dangerous and serious health and safety concerns inherent in the use of the Medical Devices to the public at large, for the purpose of influencing the sales of product known to be dangerous and defective, and/or not as safe as other alternatives.

85.     Boston Scientific utilized direct-to-consumer advertising to market, promote, and advertise the Medical Device.

86.     At the time the representations were made, Plaintiff and her healthcare providers did not know the truth about the dangers and serious health and/or safety risks inherent in the use of the Medical Device. Plaintiff did not discover the true facts about the dangers and serious health and/or safety risks, nor did Plaintiff discover the false representations of Boston Scientific, nor would Plaintiff with reasonable diligence have discovered the true facts or Defendant's misrepresentations.

COMPLAINT WITH JURY DEMAND
PAGE 21

87.     Had Plaintiff known the true facts about the dangers and serious health and/or safety risks of Defendant's Medical Device, she would not have purchased, used, agreed to have it implanted in her, or relied on it.

## VI.     FIRST CAUSE OF ACTION
## WASHINGTON PRODUCT LIABILITY ACT

88.     Plaintiffs incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

89.     At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting its medical device products.

90.     At all times relevant to this litigation, Defendant designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the medical device used by Plaintiff as described above.

91.     At all times relevant to this litigation, Defendant's medical device was expected to reach and did reach the intended consumers, handlers, and users or other persons coming into contact with these products in Washington and throughout the United States, including Plaintiffs, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

92.     In violation of the Washington Products Liability Act ("WPLA"), RCW 7.72, et seq., at all times relevant to this action, at the time Defendant's medical device left control of Defendant, it was defective and not reasonably safe. These defects include, but are not limited to, the following:

COMPLAINT WITH JURY DEMAND
PAGE 22

**Corrie Yackulic Law Firm PLLC**
110 Prefontaine Place South, Suite 304
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

a) Defendant is strictly liable for Plaintiffs' injuries and damages because at the time of manufacture, and at the time Defendant's medical device left control of Defendant, the likelihood that the medical device would cause injury or damage similar to that suffered by Plaintiffs, and the seriousness of such injury or damage had been known by Defendant and outweighed the burden on Defendant to design a product that would have prevented Plaintiffs' injuries and damages and outweighed  the adverse effect that an alternative design that was practical and feasible would have on the usefulness of the subject product.

b) Defendant's medical device is unsafe to an extent beyond that which would be contemplated by an ordinary consumer.

c) The medical device manufactured and/or supplied by Defendant was defective in design in that, an alternative design and/or formulation exists that would prevent severe and permanent injury. Indeed, at the time that Defendant designed its medical device, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

d) The medical device was not reasonably safe in design under the WPLA.

e) The medical device manufactured and/or supplied by Defendant was not reasonably safe because Defendant did not provide an adequate warning or instruction about the product. At the time the medical device left Defendant's control, the device possessed dangerous characteristics and Defendant failed to use reasonable care to provide an adequate warning of such characteristics and their danger to users and handlers of the product.  The medical device is not safe and cause severe and permanent injuries. The medical device was not reasonably safe because the warning was inadequate, and Defendant could have provided adequate warnings or instructions.

f) The medical device that was manufactured and/or supplied by Defendant was not reasonably safe because adequate warnings or manufacturer instructions were not provided after the medical device was manufactured and when Defendant learned of, or should have learned of, the dangers connected with the medical device.

g) The medical device manufactured and/or supplied by Defendant was not reasonably safe because it did not conform to an express warranty made by Defendant regarding the product's safety and fitness for use. Defendant expressly warranted that the medical device was safe and fit for their intended purposes, that it was of merchantable quality, that it was not produce any dangerous side

COMPLAINT WITH JURY DEMAND
PAGE 23

**Corrie Yackulic Law Firm PLLC**
110 Prefontaine Place South, Suite 304
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

effects, that they were adequately tested, and that the device was safe to human health and the environment, and effective, fit, and proper for its intended use. Defendant did not disclose the material risks that its medical device could cause severe and permanent injury. Defendant's express warranty induced Plaintiff to use the device, and Plaintiff's damages were proximately caused because Defendant's express warranty was untrue. The mesh product was not reasonably safe because of nonconformity to express warranty under the WPLA.

93.     As a direct and proximate result of Defendant placing its defective medical device into the stream of commerce, Plaintiffs suffered grave injuries, and endured physical and emotional pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment, loss of consortium and other damages further discussed in herein.

## VII.   PUNITIVE DAMAGES

94.     Plaintiffs repeat and realleges all allegations contained in all paragraphs above as if fully set forth herein.

95.     Defendant's conduct in designing, manufacturing, marketing, labeling, packaging and selling the not reasonably safe and defective pelvic mesh products amounts to outrageous, unconscionable willful, wanton and/or reckless conduct and/or criminal indifference to civil obligations affecting the rights of others, including Plaintiffs.

96.     The key decision regarding design, marketing, promotion, and warranties were made in Massachusetts, thus Massachusetts law applies to this claim.

97.     The acts, conduct and omissions of Defendant as alleged throughout this Complaint, were willful and malicious and were done with a conscious disregard for the rights of

COMPLAINT WITH JURY DEMAND
PAGE 24

Corrie Yackulic Law Firm PLLC
110 Prefontaine Place South, Suite 304
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

Plaintiffs and other users of the Defendant's products and for the primary purpose of increasing profits from the sale, distribution and use of Defendant's products. Defendant's outrageous and unconscionable conduct warrants an award of exemplary and punitive damages against Defendant in an amount appropriate to punish and make and example of Defendant.

## VIII.   LOSS OF CONSORTIUM

98.    Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set forth herein, and further allege:

99.    Plaintiff ROBERT MEADE, at all times relevant, was and is the lawful husband of Plaintiff LIESE MEAD.

100.    As a direct, legal, and proximate result of the culpability and fault of Defendant, be such fault through strict liability, negligence or otherwise, Plaintiff ROBERT MEAD suffered the loss of support, services, love, companionship, affection, society, intimate relations, and other elements of consortium, all to his general damage in an amount in excess of the jurisdictional minimum of this Court.

101.    Plaintiffs demand judgment against Defendant for compensatory and punitive damages such as a jury may award, and such other relief as the Court deems just and proper in order to remedy Plaintiff ROBERT MEAD's loss of consortium.

## IX.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendant on each of the above-referenced claims and causes of action and as follows:

**Corrie Yackulic Law Firm PLLC**
110 Prefontaine Place South, Suite 304
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

102.    Awarding Plaintiffs compensatory damages in excess of the jurisdictional amount, including, but not limited to past and future pain, suffering, emotional distress, disability, loss of enjoyment of life and other non-economic damages and losses;

103.    Awarding Plaintiffs their economic damages and losses, including without limitation past and future medical expenses, out of pocket expenses, lost earnings and lost earning capacity, lost household services, and other economic damages in an amount to be determined at trial;

104.    Awarding punitive damages;

105.    Awarding loss of consortium;

106.    Awarding pre-judgment interest;

107.    Awarding post-judgment interest;

108.    Awarding Plaintiffs reasonable attorneys' fees;

109.    Awarding Plaintiffs the costs of these proceedings;

110.    Such other and further relief as this Court deems just and proper.

## X.    **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demands trial by jury as to all issues.

DATED this 23rd day of September, 2019.    CORRIE YACKULIC LAW FIRM, PLLC

*/s/ Corrie J. Yackulic*
Corrie J. Yackulic, WSBA No. 16063
110 Prefontaine Place South, Suite 304
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725
Corrie@cjylaw.com
*Attorney for Plaintiffs*

COMPLAINT WITH JURY DEMAND
PAGE 26